District Court. Good morning, everyone. Before we start, I just want to say that we're very privileged to have with us on the bench today as a visiting judge, Judge Larry McKinney, who is the Chief Judge of the United States District Court for the Southern District of Indiana. It's always good to have visiting judges and district court judges join us. We have six cases on the docket today. Two of them are submitted cases. Four are argued. I will just note for the record the two submitted cases. The first one is number 06-3174, Siwa v. the Office of Personnel Management. And the second one is number 06-3251, Coleman v. the United States Postal Service. Again, those two cases are being submitted on the briefs. The first argued case that we have this morning is number 06-5003, and I will be corrected if I mispronounce this, United Keetoowah Band v. the United States. And Mr. Rossetti, correct me if I get the mispronunciation wrong. I just want to check. Now, you have eight minutes of your main argument, two minutes for rebuttal, and the United States is going to be sharing some time with you. Is that correct? That's five minutes on cross-appeal. Yes, please. OK, the cross-appeal. All right. And you're familiar with our lighting system? I am. OK, well, fire away whenever you're ready. Good morning. May it please the court. My name is Michael Rossetti. I'm counsel for the United Keetoowah Band of Cherokee Indians in Oklahoma, a federally recognized Indian tribe. Principles of equity and good conscience compel reversal for three simple reasons. First, it gives all of the beneficiaries of the Settlement Act the intended benefits and burdens under the act. It safeguards the constitutionality of the act, and it does not flout the will of Congress. From the perspective of the United States, the Settlement Act of 2002 operates to end decades of uncertainty in non-Indian landowners in the Arkansas Riverbed. And it does so through two very simple mechanisms, distinct mechanisms. First, by full consent of the three settling tribes, including the Cherokee Nation of Oklahoma, it extinguishes claims by virtue of that full consent. Second, with respect to the UKB, it unilaterally extinguishes claims in exchange for a very important benefit. Mr. Hussain, let me ask you, to what extent do the claims in your complaint extend beyond, and I think hopefully I have this right, the disclaimed dry bed lands? Because that was one of the, seemed to be one of the arguments that was being made here that, well, I'll be corrected if I'm speaking wrongly, mischaracterizing it. But the Cherokee Nation says, well, look, they're not just making claims with respect to the disclaimed dry bed lands, but their claims extend beyond that. Could you speak to that just briefly? Yes, sir. The United Kituwa Band intended only to bring the act that it's permitted to bring under the Settlement Act, such that if this court were to direct or if the court below were to strike claims that it views as extending beyond the four corners of the act, we do not oppose that. We don't below, and we would expect that. Such that if this court were to reverse on the ground that the court be directed to strike certain claims, even if it limited our claims to the disclaimed dry bed land, we have invited that remedy. And the court has always had that capacity to do so, as argued below. How do you read the statute in this case, the Settlement Act? The Settlement Act appears to define lands in a way that at some level gets a little confusing. Such that the complaint was intended to be certain that even if the claims could be brought beyond disclaimed dry bed lands, that the plaintiff plead them, fully understanding, however, that it is the Settlement Act that's the touchstone here. And that the parties must be, as is the jurisdiction of the court, restrained by the reach of the act. So at no point did the plaintiff intend to access relief and be able to argue claims beyond that sanctioned by Congress. So all of your six counts then arise under the terms of the Settlement Act? That is correct, Your Honor. Even though the Settlement Act is probably as ambiguous a statute as has ever been passed by Congress. That's not very clear, is it? In terms of the definition, that's a fair point. But the remedy of dismissing the entire action should have been measured by the court's consideration of her ability to sever claims. To make certain and safeguarding if it was indeed the case that disclaimed dry bed lands as a discreet set of lands that are extinguished. Where the claims are extinguished as it relates to those lands. If that's the limited extent of the statute in its entirety, then the plaintiffs are prepared to move forward accordingly. But what I'm asking is, all of the six claims that you have made in your complaint are all within the Settlement Act claims? Yes. On the 605A and 605B? Yes. Was there a finding by the Court of Federal Claims on that? I couldn't find it. There is not. There's an acknowledgment that she began to consider it, but ultimately, apparently, was persuaded by the necessary and indispensable party analysis. That the vague interest, the speculative interest at some point in the future, that a holding that the UKB is a successor in interest to the historic Cherokee Nation, would be of such moment in the present action that she dismissed. Without fully taking into account the fact that that really is a highly speculative claim, relies on a future hypothetical case, which would be brought on some facts that we're not aware of. And it's certainly not the case before the court. Congress fashioned the act. It intended, without a doubt, with all the parties at the table, to directly sort out the competing interests at the time, including the Cherokee Nation of Oklahoma's interest and the interest of the United Kituwa Band. Competing interests, though they may be, Congress considered them, and it did so knowing full well the underlying theory of our case, which is borne out both in pleadings by, in front of, pardon me, Judge Dammisch, and on the congressional record, that we intended to bring a case based on a theory of successorship in interest. And that it is that knowledge that the parties have had all along, the parties to the negotiation, and Congress fully understood it. Notwithstanding that, it sorted out the claims for itself. And all one has to do is look at the act to see the robust participation of the Cherokee Nation. It doesn't require any off the record knowledge. In fact, when you look at the benefits under the act, as bestowed by Congress, it gets the lion's share of the $40 million authorized, at least $18 million. I have a trial judge's question. Do you think you'd be in the same position today if you had voluntarily limited the scope of your request for relief, just by count one? I think that's unclear, Judge. Given the fact that the Cherokee Nation's argument is really broader than that. They argue simply that by virtue of Congress's lack of an abrogation of sovereign immunity, that trumps everything, and therefore the case must be dismissed. In effect, reneging on the benefit of the bargain that it struck at the negotiating table, as embodied by tribal resolutions and this act. In addition, Congress bestowed others substantial benefits on the Cherokee Nation of Oklahoma, including special trust acquisition status, which is much coveted, as you may know, in these Indian cases, and which the other two settling tribes didn't even obtain as benefits. So in terms of beneficiaries under this act, aside from the landowners who now have peace in the riverbed, the Cherokee Nation of Oklahoma was in a unique position to obtain more benefits than any other party, especially when considered in light of their relatively modest opportunity to litigate a claim. Excuse me, because time flies, and I apologize for jumping in on you. But I wanted to ask you this, in thinking back over my little discussion with you, and then your colloquy with Judge Gallarza, are you inviting us, if we feel it's necessary, to, in effect, say that you can proceed, but only under certain claims? In other words, you're saying, I think, that we have to look at the statute, and then your complaint. And if we see something in your complaint that is beyond the bounds of what the statute allows you to present, that you're inviting us, if we feel it's necessary, to cut back on what you're claiming. Is that correct? We would invite a reversal on that basis, mostly because the court below had that same ability to fashion that remedy. It's a way of mitigating the prejudice that if this court feels there is any, that the Cherokee Nation of Oklahoma claims. And our intention all along has been to only litigate claims here that Congress sanctioned, as we regard the Settlement Act as the touchstone of this case. Okay, now I think you are, let's see, you have six minutes left on your side. And I guess the government is going to, you've used eight minutes so far, and I think the government is going to now speak for five minutes. Is that correct? Yes, Judge. Mr. Shilton? Thank you. I recognize, Mr. Shilton, that you and Mr. Rossetti are temporarily aligned with each other. And you're only, you're arguing the indispensable party point, is that correct? That's it, just that point. And we're here because we're trying to defend an essential part of the Settlement Act itself. And the result below basically renders an important provision futile. And that is the provision of a cause of action, so that UKB has a chance to have it stay in court on whether or not it does have a claim to this riverbed area. Now, Congress was well aware that the claims of UKB and Cherokee Nation overlapped here, but it came up with a fair solution. It extinguished all of the claims, the Cherokee Nation got direct compensation. UKB gets a cause of action to have it stay in court. And there was this unique provision where 10% of the Cherokees award is put in a special holding account, and if UKB can succeed, then it gets that. So- So let me ask you, do you read the statute as extending beyond disclaimed dry bed lands? No, the position of the United States has been that it only extends to the disclaimed dry bed lands. We haven't briefed that here, but that has been our position below. But we agree with Mr. Rossetti that the CFC simply went too far. And if the problem here is that the complaint is overdrafted and claims too much, the solution is to pare back the complaint, to dismiss those counts which are beyond the act. But certainly the count one, which asks for resolution as to the disclaimed dry bed lands, that should go forward. Do you read the complaint beyond count one as seeking more than just claims with respect to the disclaimed dry bed lands? It appears to do that. So we think a result which struck the other claims would be a fair result and consistent with Congress's intent, and that's really what should govern here, I think, is congressional intent. The problem with the CFC judgment is that it rebalances a balance that Congress had already struck. Congress was aware that the Cherokee Nation would be concerned by a suit which got to the merits, but said this should go ahead anyway. And Rule 19 doesn't allow a court to overcome that balance and say no, this suit can't go ahead because the infringement on the Cherokee's interest are just too great. You're saying the considerations that are set forth in 19B weigh in favor of allowing the suit to go forward. They do, and those considerations must be read in light of congressional intent. This is a very unique case. We couldn't find one like it where Rule 19 has been used where there's an express congressional provision of a cause of action. There's just no precedent for a court dismissing a congressional cause of action on Rule 19 grounds. And we think, as Springport said in Albemarle versus Moody, that when you do an equitable balance, you have to do it in light of congressional intent. And the overwhelming congressional intent here was to make sure that there was quiet title, that the private landowners would have peace. And the only way to do that is to make sure that these claims get litigated on the merits, and then there'll be peace. But that's only on this claim, dry bed lands, right? That's right. Now, what about the mismanagement of the riverbed? Well, we think- The wet bed lands and the dry bed lands? Well, this is another part of the compromise, I guess, that Congress came to, that they felt it appropriate for UKB to be able to go ahead on the dry bed lands. But that's all. And you can call it rough justice, if you will, but this is where Congress came out on this settlement. And we think UKB should be able to go ahead with that. I don't want to take time away from- Well, the aspects of the riverbed claims, though, make up the greater portion of the account below, right? They have six counts in their complaint. Well, they do, but I think the heart of the matter is the disclaimed dry bed lands. And I think Mr. Rossetti's comments have indicated here. I think the other claims, they felt that they had to put them out there, because there are some ambiguities in the act, in order not to waive them completely. But I think the heart of the claim is to the disclaimed dry bed lands. Are there any other tribes that have filed under the 180 day requirement? No, UKB was the only one. The only one, yes. Thank you. Mr. Schill, thank you. You went over your time. Mr. Rossetti, we'll restore your full two minutes of your rebuttal. And Mr. Miller, if you need any additional time, we'll give you an additional two minutes, sir. So that it works out evenly for everybody. So you have 15 minutes plus an additional two minutes for 17 if you need it so it's evened out. May it please the court, at the end of the joint appendix, the white volume at page 597, the United Kituwa Band of the United States agree, 597, almost the end of the volume, that the core issue in this case is whether or not they are the successor of interest to the Cherokee Nation. And on the bottom of that page, whether if they prevail in that regard, they have a definable interest in the Arkansas Riverbed lands. Those are the core issues, and Judge Firestone made a finding on that basis. It's unthinkable that the Cherokee Nation would not, that this case could proceed in the absence of the Cherokee Nation when the Cherokee Nation's title to the Arkansas Riverbed is at issue. Mr. Mayor, let me ask you, you obviously heard the discussion that the panel had with council on the other side in this case, and Mr. Resetti says look, if we've gone beyond what you think the statute lets us do, you can cut back, or presumably you can tell the court of federal claims to cut back, and just limit us to the disclaimed dry bed lands. And Mr. Shilton seemed to be in agreement with that kind of an approach. Let's assume for the moment that it was clear, that the only claim that the Kituwa Band had here was with respect to disclaimed dry bed lands. Would you still be in the present posture you are? Absolutely, Your Honor. And why is that? Because a ruling by this court that awards just compensation based on a determination that UKB is a successor in interest and owns, say, 10% of the dry bed lands, depends upon the interpretation of the treaties under which these lands were conveyed. A necessary part of the final judgment that awards money damages has to be that the United Kituwa Band owns a 10% interest in the Cherokee Nation's lands. Why do we need to get to that point? Why not just interpret the statute? They're suing under the statute. They're not suing under the treaties, are they? Well, they're suing under the Tucker Act, Your Honor. They talk about a fresh cause of action. No, the Tucker Act only waives sovereign immunity. They're suing under the statute 25 USC 17, whatever the section is. Because that's the money mandating statute. Tucker Act is not money mandating. Section 608. Go ahead. Section 60B of the act authorizes them to file a claim relating to the extinguishment. It doesn't establish a separate cause of action. If they have a cause of action, naturally it's for a fifth amendment taking. That's the theory of their case. It only applies to disclaimed dry bed lands, correct. But the only way in which they can recover in this case is if they secure a ruling that they are a successor in interest to the Cherokee Nation. Now, it has a direct implication. A successor in interest or a successor at the same time, or co-successors to the Cherokee Nation? I mean, if you go back throughout history, there is a question as to who's who and what's what under the treaties. Well, there are other places that are absolutely, Your Honor. In this case, the present day Cherokee Nation litigated in the United States Supreme Court its ownership to the Arkansas Riverbed. It was the present ownership of the Cherokee Nation that was confirmed in the Supreme Court, reaffirmed in 1972 by the Court of Appeals of Cherokee versus United States, and reaffirmed by Congress in the statute, which says that they preserve their exclusive title to the riverbed. But Mr. Miller, what about the Settlement Act? The Settlement Act provides for claims of other Indian tribes under Section 8. Yes. What does that mean? Let me address the Settlement Act directly. Prior to Section 608 being drafted, this statute was a complete entity. It had been bargained for. It had been approved by the tribes. It had passed through the House. In that context, Section 605 has a provision designed to protect the occupants of these disclaimed drive bed lands. Recall that the driving force behind this legislation is to get rid of any cloud of title by these occupants and their descendants. So there's a provision earlier in 605 where the extinguishment of the nation's claims occurs. It says, not going to be any more litigation. Nations can't be sued. Disclaimed drive bed occupants cannot be sued. And then this issue comes up. United to a ban arises. They file a motion for intervention some 40 years after all this litigation has been going on, after having lost their position in the Eastern District of Oklahoma. But the point is they come in at the end. So now Congress has to pause and think, wait a minute. We've never heard of other tribes having claims. And there's no way we're going to allow there to be a cloud on the title of these occupants of the disclaimed drive bed lands. We've got to make sure there will be no litigation that involves them. So they write a fresh section, 608. Having earlier said there's not going to be any litigation, now they have to reserve a right to litigation. Because if you had a statute that extinguished without a remedy, you'd have an unconstitutional statute. So they provide a remedy for any tribe. And it might be the Osage. It might be the Quapaw. They had lands in this area. It might be a tribe claimant in the areas owned by the Choctaws or by the Chickasaws. So reserve accounts are set aside for that purpose. But all it does is establish the right to come to court. And although my colleagues talk about the clear intent of Congress, two things, Congress's knowledge of this particular claim and the clear intent of Congress. Mr. Miller, do you, getting back to just to pick up, because I think you'd finished answering Judge Guyarza's question. But picking up, do you read the Settlement Act as just speaking to disclaimed dry bed lands? Or do you read it as speaking to more than that? The 608B1, no, just speaking to disclaimed dry bed lands. Incidentally, with regard to that, even the United States answer never denies the court's jurisdiction over counts two through six. And in the three-year life of this case, they've never moved to dismiss those counts, although there's been discussion, as occurred today, also in front of Judge Firestone about that issue. But on the issue of- So you would say, though, that the 608 only contemplates someone being able to come in, such as the Kituwa Band or another tribe, with respect to disclaimed dry bed lands? That is correct. So did Congress contemplate, with knowledge of the claims, an adjudication on the merits? No. You cannot find the word merits anywhere in the statute, and you can't find it in the thin legislative history that exists. So why invite these people to the courthouse if they find the door shut? Well, Your Honor, as Justice Brandeis put it in Turner v. United States, 248, 358, a right to have a form is what Congress gave, not a substantive right to recovery. In that case, Mr. Turner had been authorized by Congress to sue for depredations caused by a large group of Creek Indians. Very detailed statute saying you can sue for damages, for the destruction of some 80 miles of fencing. Turner v. United States and Creek Nation. And the court says, no, the Creek Nation's not responsible for mob violence. Mr. Turner goes up on appeal and says, wait a minute. I got a substantive right of action to recover against the Creek Nation. What's going on here? He'd been pursuing this claim for years in the Creek Nation tribunals. Supreme Court says, no, you have a right to come to court. You don't have a substantive right to win. The same is here. The same is true in the Seneca Nation Settlement Act we cite to your honors. Congress says within 180 days you can bring a lawsuit to challenge the constitutionality of the act. Lawsuit is brought to challenge the constitutionality of the act. Influent, Second Circuit, case dismissed. Why? Seneca Nation is an indispensable party whose sovereign immunity precludes joinder. Mr. Miller, let me ask you, if in the court of federal claims, if Judge Firestone had disagreed with you, could the Cherokee Nation, now whether it would want to or not is another question that I can't properly inquire into, but could the Cherokee Nation have come into the suit as an intervener to participate? As a matter of power or court rules of intervention, I think so, your honor. Yes, yes. I wanted to point the court to the legislative history. Congress said in a dialogue between Senator Inhofe and Senator Campbell, talked about the merits of the claim, not precisely, but this way. Mr. Inhofe, it is not Congress's intent to express any opinion or have any effect on the claims the UKB might bring. And Senator Campbell says, correct. To my knowledge, Congress has not reviewed or considered these claims. In fact, all that UKB asked, we see in the colloquy, is UKB asked to be put in the same position, the same position it would have been prior to the effective date of the act. Now, what's the same position? The same position would be that UKB would be subject to the rules of this court. UKB would be subject to the rules of evidence. We subject to defenses of waiver, and estoppel, and res judicata, and collateral- Well, they're not saying, I guess they're not saying that, I guess Mr. Rossetti would say, well, look, I don't certainly have a guarantee of winning my case, but the statute does give me a guarantee that a claim properly within the confines of the statute will be heard. He says I get a right to get to trial and try my case. And we say no, if Congress wanted to do that, and goodness knows in the Indian claims area, particularly, Congress knows how to do that. They waive defenses expressly. They waive defenses of sovereign immunity. Sometimes Congress establishes, as a matter of fact, the value of land at issue in a case. That occurred in the Assiniboine legislation. Congress- One of the things, we're talking about the statute here. And again, I'll make the same apology I did before for jumping in on you. Mr. Shelton said that his research, I think it was, he said that his research had not found any case like this where there was a statute, whatever it says, that purportedly frames the litigation, if you will. Do you agree with that? I mean, has your research found- No, no, no, I don't. I mean, I think there are close cases. I think Fluent is a close case. I think the Sherman case from the Ninth Circuit is a close case. These cases that challenged the Hoopa-Urock Settlement Act, where the constitutional question, in fact, the issue was raised, this is a violation of the First Amendment right of access to the courts. How can I not be able to go into court and have my day in court in the constitutionality of an act of Congress? And the court correctly said, well, you can come into court, but you're subject to the rules of the court. And those rules include Rule 19. Mr. Miller, hypothetically, the Congress could have just passed a statute saying that the tribes no longer have an interest in these properties, period. They could have just quieted title by takings, right? And allowed the tribes themselves to proceed against the federal government in the court of claims for the takings. Could have extinguished the title- They could have- And made the tribes come to the court of federal claims. Correct, that's what they did. Without the settlement act, as presently posited, they could have done that. All of the tribes then would have had an opportunity to present their claims to the court of claims for damages for the particular takings. I apologize, Your Honor, but I'm not sure whether you're supposing without section 608 or without the settlement act- I'm just saying, hypothetically, Congress could have extinguished the titles and said we are taking the properties, whatever they are, of all of the bands that have an interest in it. At that point in time, the tribes would have had an opportunity to go before the court of claims saying, I'm tribe X, I'm tribe Y, I'm tribe Z, here's my claim. I think if Congress was mindful that such a claim would involve claims against one another, Congress would do what it did in the Chickasaw, Choctaw, Cherokee legislation. In which it granted the court, district court, jurisdiction to resolve claims as between the tribes and waive the immunity of the tribes vis-a-vis one another. So Congress is mindful of sovereign immunity. I mean, Santa Clara Pueblo reminds us that Congress has an awesome power over the sovereignty of Indian tribes and courts are therefore correspondingly constrained in impairing the rights of sovereign tribes as they adjudicate cases. Well, the Congress can impair the sovereignty of the tribes. Absolutely, absolutely. Say no to them, right? But it never happened here. Well, it never happened here, but hypothetically, it couldn't have been a settlement act as such. There was no settlement act. The tribes go in to the court of claims and prove their case. Yes. Why is this any different? Well, it isn't any different. I think when the tribes come in, let's say the Cherokee Nation comes in to prove its claim in that environment. Well, although they didn't do anything for 40 years, we know that the UKB filed an amicus brief in the district court, the case pending before Judge Damage, and argued that it was an indispensable party in the case had to be dismissed. And now the shoe is on the other foot. UKB is bringing such a claim and the Cherokee Nation is saying, Rule 19, it impairs our interests. Difference, of course, is that our interests have been confirmed by an act of Congress and by the Supreme Court. But does it impair your interest under the Settlement Act? Does it impair your interest under the Settlement Act? Where is your interest impaired under the Settlement Act? Well, they claim an interest relating to the subject of the action. And in this situation, the interest is the Cherokee Nation's exclusive title to its lands under the 1835 and 1848 treaties. That's an interest relating to the subject matter of the action. And there's no way to make findings and conclusions of law and an award of money without resolving that fundamental question. There's just no way around it. Now, Judge Firestone asked Mr. Rossetti, give me a limiting principle. Tell me that your title to the disclaimed dry bed land comes from statute X that doesn't implicate other riverbed lands or other lands. And they're unable to do so. And their complaint is honest. They don't claim based on a particular right specific to the disclaimed dry bed lands. Let me ask you, I'm sorry, let me ask you this, Mr. Miller. Assume for the moment the case was in its present posture limited to solely the disclaimed dry bed lands. I want to make sure I understand what your concern is if the case was so limited. Your concern is that if a determination were made that the UKB was entitled to some compensation for disclaimed dry bed lands, that would necessarily involve a determination that the Cherokee Nation had somewhat less claim to the lands, right? Is that what you're- Absolutely, and if we play this out, it really becomes apparent. The title owner to the Cherokee Nation's trust lands is naturally the United States. The United States owns all Cherokee Nation trust lands, holds it in trust with the Cherokee Nation. But what about the fact- Now, we may not be bound by raised judicata, we wouldn't even be here. But the United States will be bound, and I cannot believe- Even if all these are disclaimed, right? You say this doesn't make a difference even if it's disclaimed, because your view is that they would have to nevertheless prove a right to them, even though your tribe would disclaim them. If I follow your honor, the Court of Federal Claims makes a ruling that the United Kituwaban is a 10% undivided owner in Cherokee Nation lands, and therefore a 10% owner in disclaimed dry bed lands. The United States thereafter is going to be compelled to share royalties, revenues, leases. Its trust responsibility is going to run to the United Kituwaban- You're saying they can't just make a determination with respect to the disclaimed dry bed lands without implicating rights of the Cherokee Nation? It's impossible to slice it that thin, that's why. Does the Court of Claims have jurisdiction to determine title? No, your honor. I mean, U.S. versus Sherwood. As between private parties, it's impossible. So all we can do is give damages, right? Against the U.S. No, no, title that's between competing applicants, or claims as between competing applicants. In Sherwood, it was a judgment debtor versus a judgment creditor, and the United States is kind of in the middle. In this case, we're talking about title claims between two separate private parties, vis-a-vis the United States. And this court doesn't have jurisdiction, although I have to recognize that Judge Firestone did not reach that alternative ground, which we did urge below. Finally, I would like to note that the question has been raised about the constitutionality of this act and reliance on the Supreme Court's decision in Blanchett. I just want to make two points about this. One is never raised below, and only raised in a reply brief. And secondly, Blanchett tells us what's the constitutional statute. In fact, that involved the Penn Central and legislation dealing with the bankruptcy reorganization, and whether or not the property had been taken, and where is the right of just compensation. And the statute didn't say you can come to court. It was actually, like Judge Chigaiyara's example, Penn Central was saying the statute, which litigant was saying that the statute's unconstitutional, and the court said no, no. The Tucker Act is always available and is never implicitly repealed. When a taking occurred, you need an unmistakable, clear statement. Just as you do for waiver of sovereign immunity, you need an unmistakable, clear statement. And for that reason, I believe the Cherokee Nation must prevail in this case. Thank you, Mr. Miller. Mr. Resetti? Sid, you'll have your full two minutes rebuttal, but you do have to be careful and confine it just to that. I will do so, thank you. No court has determined to date whether the Cherokee Nation of Oklahoma is the sole successor in interest to the historic Cherokee Nation. Nothing that we would propose doing in the court below would compromise any status that the Cherokee Nation of Oklahoma may have as a successor in interest to the historic Cherokee Nation. One way of looking at the record is also, pardon me, also makes it clear that the UKB has tried other ways to participate. It tried to participate in the litigation below. One can only assume based on the meager bundle of rights that it also intended to participate there. The central problem with accepting the Cherokee Nation of Oklahoma's argument is that now that it seeks to avoid the troublesome part of the deal that it struck, even though it leaves the United Kituwa Band out in the cold with no remedy, it acknowledges that the Cherokee Nation of Oklahoma's consent was illusory. And worse than that, that Congress would have countenanced that. Whatever the Cherokee Nation's intention that the negotiating table may have been, we won't know. But certainly, in asking this court to reverse, we ask that this court not provide the Cherokee Nation of Oklahoma with an opportunity to avoid the very narrow mechanism that the United Kituwa Band has at its disposal to try its claim on the merits against the largest defendant in the world. The United Kituwa Band respectfully joins the United States in requesting that this court reverse the court of claims order. Thank you. Mr. Rossetti, thank you. Mr. Shilton, Ms. Miller, thank you. The case is submitted.